May it please the Court, Renee Coppock on behalf of Trustee Kimberly Johnson. We are here today to request this Court to overturn the lower court's decision that in effect denies reasonable access to trust property. As you've read, the trust property is uniquely you proceed, even with its unique aspects, however, the trustee is charged under Montana law with making property productive. However, there's no direct access to this property, making that impossible. Perhaps most telling is the fact that if you look at the trails and how they are defined in the record as well as the historic access to the property that was cited by the government. The speculator trail was used to the property, admittedly, by miners beginning in the late 1800s. Obviously then stock was used as opposed to vehicles because motorized vehicles at that point were nonexistent. And then it would have taken some time for vehicles to be developed that could actually traverse that terrain. At this point The duty we have at this stage of this case is to determine whether the decision about adequate access was arbitrary and capricious. So that's, you're going to have to persuade us that the service acted arbitrarily and capriciously in failing to give you the kind of road building rights that you had asked for. Right. We are saying that their decision was contrary to both the Wilderness Act and ANILCA and the way that they viewed this, what they called similarly situated properties was, in fact, arbitrary and capricious. They are saying that we have trail access to the property and helicopter access to the property. But the record shows that all the trails, the Great Falls Trail, West Boulder Trail, Silver Lake Trail, Four Mile Trail, all and the Speculator Trail all end prior to reaching the property. And that it's open alpine terrain and easily accessible from the trailhead to your property. From the ending of the trail? No. I mean, that's also part of the record, that it's above the timberline and therefore a straight shot across open terrain to the property from the end of the merged trails. And that's where we say that the information in the record is misleading. If you look at the maps and the altitude, you can see that you still gain altitude and the affidavits that we had attempted to submit show or indicate that it is not just a walk in the park. It is, in fact, rough, rugged terrain with ridges and hard to reach the property, making it treacherous at times as one of the affidavit states. And plus the Forest Service has made it abundantly clear by the Supplemental Excerpt of Record 242 that any trail cutting or maintaining a trail from those established trails to the property will also be part of a permit process. And they said we would need a survey, construction plans and entire NEPA analysis and that that would take quite some time. And if you look at the similarly situated properties that they reviewed in the Absaroka Beartooth Wilderness, you'll see that they're not similarly situated at all. The phrase cannot just mean any inholding. And it appears to us that they tried to find all the inholdings in the wilderness. But by definition, to be similarly situated, it must have many of the same characteristics such as altitude, terrain, proximity to roads and other access to availability. But these properties, when you look at them, all have other features which equates to easy access, I'm going to say, as opposed to the really strenuous, tough access to the trust property, which is by the Forest Service measurements nine miles from an existing road. The properties mentioned are not at the altitude of 8,300 to 10,000 feet. So that helicopter access and foot and livestock access to those properties isn't as precarious nor difficult. There's no evidence that those other properties required helicopter access. The lodges and cabins and outbuildings on the other properties were already constructed prior to the wilderness designation. And that's what really makes this different, is that Ms. Johnson wants to build lodges and cabins up on this property, but she's forced to take building materials by helicopter, which is making it extremely expensive. Five of the 19 properties have motorized access over other private properties. So to us, that is not similar at all. Where does the wilderness end? Is this entirely within wilderness? Yes, on the back side of this, however, there is one more mining claim. But otherwise, it's entirely within the wilderness, yes. Well, doesn't that change things? Doesn't that create serious problems? There are constraints on wilderness property that would not necessarily apply to general forest service property. Right. But ANILCA, first the Wilderness Act, when you have to look at when it was promulgated in 1964, and that was after eight years of debate. Eight years. And if you look at the Wilderness Act, you know the act is written subject to private, existing private property rights, i.e., one of those being access to your property. When that became another issue, ANILCA was passed, again stating that there must be access to inholdings, including wilderness inholdings. But doesn't it leave to the fair judgment of the federal agency to determine what level of access is necessary, given the surrounding area and other uses and so forth? Yes, but that goes to if you analyze the Adams case, it says there must be viable access and the property must be economically viable with that access. So if they're saying just because this is wilderness, you must walk up the trail, but yet we can't build on the property, we can't do anything else with the property but hike to the property and view the property or helicopter items in, that raises it to another level. And Adams says you have to look at that economic viability and also if you look at the federal register sites that were in the record, the department at the time they were promulgating the regulations in the CFR, they said the department, the Department of Agriculture, the Forest Service, was cognizant of the fact that it could not, under ANILCA, impose substantially more stringent requirements on access through wilderness than other Forest Service lands. And I think that's very telling, that because the government has decided that its surrounding land is wilderness, you private party are not going to have to suffer the consequences. You are still going to have access to your property. Yes, there may have to be mitigating circumstances on the NEPA analysis to figure out exactly where the road is going to be located and what mitigating factors will be determined. Yes, you have to have a speed limit. And other factors that are reasonable to administrate the road. Yes, you have to lock the gate at the end so other parties cannot use the road and therefore violate the wilderness. What specific kind of access did you ask for in this case? A 20-foot wide gravel road up Speculator Trail to the property. With permission to use motorized vehicles? Yes, with permission to use motorized vehicles. Not only to get to the property, but to build the road. Counselor, there's a dispute between you and the United States over the question of the cost of building that road. Are the Forest Service findings on the cost of that road clearly erroneous? I mean, not clearly erroneous. I mean, are they arbitrary and capricious? We felt that the cost of building the road was arbitrary and capricious because it never said the report never indicated that they visited the property, looked at the terrain. I think in one of the briefs, the Forest Service said, well, yeah, well, back in 1994 we visited the property. But a lot has changed, as can be seen by the letters back and forth of the trust trying to clear the trail and in one year clearing 200 deadfall and then trying to clear more trail and the fact that various aspects of the road have changed, the fact that you can't find the trail in part of the places. So we thought, well, they haven't taken into consideration those things, nor where exactly you would make switchbacks. Let's suppose that we thought that the Forest Service findings on the cost of the trail were not in error, that they were at least not arbitrary and capricious, that there was some basis for some dispute or a range of prices on the cost of building the road. What implications does that have for your clients? Are your clients capable of building the road at the higher price? Or is this an important distinction between you and the Forest Service? I would say this client is probably capable of building the road at the higher price, but I'm not quite sure we look to the client, but we look at the property. The trust has always maintained it would be willing to pay for the road, and that's particularly in light of the fact that it doesn't think it will cost $1.5 million to build the road. But if it were? If they staked out their road and they determined it costs $1.5 million, I guess at that point the trust itself would have to decide whether to build the road or not, because it has maintained that it would bear the cost of building the road. Kelsey, do you want to reserve your remaining time, or if that's up to you? I would just like to say, with regard to the affidavits that were not allowed to be submitted, that these affidavits were submitted to show that the Forest Service did not adequately consider the cost of all the relevant factors, and to show that it was arbitrary and capricious and that just blatant statements that a road through the wilderness is going to disturb the wilderness is not sufficient. The Warchola report, the Johnson affidavit, and the Seavers affidavits in particular did not give any information that the Forest Service did not know, but it was not apparent from the administrative record. I mean, frankly, we didn't know until we received the administrative record that there were this many documents compiled in this instance, and as we've pointed out in our briefs, many of those were after the fact. Well, now, are these the same documents that the Forest Service requested earlier, or at least not necessarily the same documents, but similar data? No, the only thing that's similar is the Frankovic, anyway, the mineral analysis. Yes, that was requested. But you declined to provide it, is that right? The Forest Service did not provide it because it was preliminary in nature, and they knew they would have They invited you to provide it, did they not? Oh, I mean, sorry, I misspoke. The trust did not provide it because they knew it was preliminary in nature, and the trust didn't want to spend the next several years debating the mineral value, but wanted to get on with the more important, are we allowed to build a road here or not? The other information as to the steepness of the trails, condition of the trails, the difficulty of the alternate routes is nothing that the Forest Service asked for, it was, in their knowledge. And so I would like to reserve the remaining time. Thank you so much, counsel. We'll now hear from the Forest Service. I notice that there are two counsel here. The Wilderness Society intervenors are also represented. Have you allocated time among yourselves? Yes. Mr. Presto and I have agreed to split our time today with me speaking for about 13 minutes. And he's seven. Correct. All right. Very good. You may proceed. Good morning. May it please the Court? Matthew Sanders for the Federal Appellees. To – because this case involves a piece of property, I would like to direct the Court's attention to the third map at the beginning of our supplemental excerpts of record, fold-out map C. I think this map is helpful in understanding the property. I'll get straight to the issues that the Court seemed interested in and that Ms. Coppock addressed here today in her argument. I would like to begin by addressing the legal provisions that are at issue in this case. The – under ANILCA, the Forest Service alone has significant discretion to determine what constitutes adequate access to secure reasonable use of an inholder's property. I'm guessing at this stage that ANILCA does apply to this property. We do not. In the argument that it was limited to Alaska, we are over that now, right? We do not dispute that. That is, 16 U.S.C. 3210a explicitly says that subject to such terms and conditions as the Secretary of Agriculture may prescribe, the Secretary shall provide such access to non-federally owned land within the boundaries of the national forest system as the Secretary deems adequate to secure to the owner the reasonable use and enjoyment thereof. At the same time, this discretion is limited by the Wilderness Act, which requires the Forest Service in determining what constitutes adequate access to ensure that there is not lasting impairment to wilderness. And in the applicable regulations, the Forest Service has carried through that mandate and said that it will avoid in all instances lasting impacts to wilderness, and that when there is a tension between granting access and impacting wilderness, that considerations of protecting wilderness will trump. Under this legal framework, in this case, the Forest Service considered all of the relevant factors and articulated an eminently rational basis for its decision. Now, the trust here today has raised both the issue of whether there is adequate access to the property and the Forest Service's consideration of similarly situated properties. Let me start with the latter first. As the Forest Service found, similarly situated properties, that is, properties completely surrounded by wilderness with no historic road access, that is, no road access prior to designation of the Absaroka Beartooth Wilderness in 1978, do not enjoy roaded motorized access. That is a highly relevant consideration because it imposes upon the proponent of access a special burden to explain why the significant impacts of road access would be warranted and would be required. That is, why is a road the only form of adequate access? But that's not a – historical use is not a controlling factor. Absolutely not. And it wasn't the controlling factor in the Forest Service decision here.  Historic access, access enjoined by similarly situated properties, the mineral potential of the property, the trust's intended uses, the impacts to wilderness, and various other factors to arrive at a rational decision and conclude that other forms of adequate access exist to the property. With regard to those other forms of adequate access, trail and helicopter access are, in fact, adequate in this case. The trust, particularly in its reply brief, disputes that contention, that fact, rather. However, there are five national forest system trails that combine to form four routes to the trust property. These come to within one-half to three-quarters of a mile of the property. In addition, there are non-national forest system user trails that connect these national forest system trails to the property itself. Contrary to what the trust argues in its reply brief, it does not need authorization for non-commercial overland travel by foot or horseback across these user trails. If, however, the trust wants to travel by these trails commercially or to improve or further develop them, it need only apply for authorization to do so. And the record is replete with the Forest Service willingness, examples and evidence of the Forest Service willingness to work with the trust to improve access to its property. I would direct the Court's attention specifically to supplemental excerpts of record, pages 190 through 95, 240 through 42, and three adopted trail agreements, which are in the administrative record at numbers 74, 78, and 115. In addition, helicopter access is completely adequate here. The trust disputes that fact, citing cost and safety concerns. However, as a comparison of supplemental excerpts of record, pages 225 and 229 make clear, you could have a large number of helicopter trips, and it still would cost significantly less than a road that costs $1.77 million to construct and $53,000 a year to maintain. Is there any significance to the representation that the trust would be willing to pay the cost of the road? I don't think there is any significance to that. But I do think that the cost, that very high cost of the road, is an important consideration in response to your question, Judge Beide. The cost is relevant because it shows both, it goes both to the reasonableness of the trust's intended recreational uses of its property, which we addressed in our brief, and also it supports the Forest Service decision that other forms of adequate access are available here. And that is, these other forms of adequate access can be improved, if the trust wishes, without expending $1.77 million. As for the dispute about the cost, in its proposal, the trust estimated that the road would cost about $100,000 to construct, $5,000 a year to maintain. Later, they changed that estimate to $225,000. The Forest Service requested information about the cost estimate. The trust refused to provide that information. However, the Forest Service here used a licensed engineer to determine the cost of the road. And again, if you look at this map, it's very clear that this is not a $100,000 road. Again, this is designated wilderness, and you can't just take a bulldozer to it. It's going to cost a lot of money to grade the road and provide cut and fill slopes and all those sorts of things, and the Forest Service has a lot of expertise in building roads. It's very clear that it arrived at a reasonable and certainly not arbitrary and capricious assessment of the cost of building and maintaining this road. But getting back to helicopter access, helicopter access in this area of the wilderness and indeed in other rugged wilderness areas of the United States, including Alaska, is a typical form of access. The trust would have this court believe that it's a very unique and extraordinary thing that the Forest Service is saying exists here, but it's not at all. This property has been accessed by helicopter in the past. Are there any collateral consequences to suggesting that the trust ought to be using helicopters or that helicopter is a reasonable form of access? Do you mean impacts on the wilderness? Yeah. Well, the report by – The only thing that the Forest Service really wants to invite is regular and routine helicopter use. That's addressed specifically in the record, and I wish that I could point you to a specific page, but the report compiled by Kimberly Schlenker, which is the report on the impacts to wilderness of building a road, specifically indicates – and we address this point in our brief – specifically indicates that trail access and helicopter access do have impacts to wilderness, but that those impacts are significantly lower and less severe than the impacts of building a 20-foot-wide road, nine-mile road through designated wilderness where one doesn't exist. So certainly the Forest Service has recognized that there are impacts that – to be had on the wilderness through other forms of access, but helicopter and trail access here provide adequate access, and the Forest Service recognized that it had an obligation and has a continuing obligation under ANILCA to provide adequate access. But again, helicopter access is completely adequate, and transporting vehicles and materials, building materials, is completely reasonable by a helicopter. If you look at, for example, supplemental excerpts of record, page 18, that's a photograph of a cabin, a historic mining cabin on the property that was built around the turn of the century. They were able to build a road many, many years ago without helicopters. Certainly transporting in – or building materials and vehicles by helicopter makes building a lodge and recreational cabins, to the extent that's a reasonable use of the property, a completely feasible thing. And also look at supplemental excerpts of record, page 21. That shows a motorized – a vehicle that is used to help improve trails on properties like this one. As for the similar – well, the constraints on granting access through the wilderness, I would just like to – or I would urge the Court to look at the Federal Register, 56 Federal Register, pages 27, 410 through 17. And in those pages, in promulgating regulations under ANILCA, the Forest Service made it very clear that it had discretion to grant the kind of access that it deemed adequate to secure reasonable use of property, and that there was nothing in ANILCA that took away or undermined that discretion. And that discretion, like I said, is limited by the Wilderness Act's non-impairment mandate. As for the evidentiary issue, the affidavits, the district court did not abuse its discretion in refusing to admit the extra record affidavits. As we pointed out in our brief, the trust refused to provide the information it now says is essential for review. The Forest Service, in reconsidering the trust proposal, specifically asked for information pertaining to the mineral potential of the property, pertaining to its cost estimate for building the road, and any other relevant information, that is, information relevant to whether its current means of access were inadequate and why they were inadequate. But the trust refused to provide any such information. The trust argued in its brief, and argues again here today, that the information contained in those affidavits is relevant to those issues. But the trust refused to provide any such information during the administrative process. That's exactly the tactic that Vermont Yankee forbids. And as we pointed out in our brief, and as I've implicitly said here today, the extra record affidavits don't reveal anything, any relevant factor left unconsidered by the Forest Service, and they don't show that the Forest Service failed to adequately explain its decision. If the Court doesn't have any further questions, I'd like to see the rest of my time, too, Mr. Presso. Thank you. Mr. Presso, is that right? Yes, Your Honor. Good morning, Your Honor. Timothy Presso for the Wilderness Society and the other intervener appellees. Just a few brief points. I want to talk briefly about what's fundamentally wrong with the trust's case before you. And that is, if you look at the application the trust submitted to the Forest Service for this proposed road, it's on pages 17 through 21 of the trust's excerpts of record, what you will see is a very bare-bones application. There is not one word in that application about the difficulties of existing trail access, not one word about why those trails and helicopter access together are not sufficient to build a lodge, as other properties in the wilderness have done. There's not one word as to the mineral potential of the property. There's not one word about similarly situated properties. And yet the entire tenor of the trust's case here is that the Forest Service failed to consider the relevant factors. Well, the burden is not on the Forest Service. If you look at the regulations, 36 CFR section 251.112B states that the applicant must, quote, provide reasons why the existing means of access. The burden is not on the Forest Service. Did you mean that? I'm sorry. Did I misspeak? I said the burden is not. Oh, it's not? Not. Oh, excuse me. A key word in that sentence, Judge. If I didn't say it, I apologize. The burden is not on the Forest Service. The applicant has to show why the existing means of access do not provide adequate access to the landowner's property. And when the Forest Service promulgated that regulation in the Federal Register, 56 Federal Register at 27415, it clarified that, quote, providing the factual information needed for the analysis is the responsibility of the applicant. Now, I was keenly sensitive to this point because I can tell you that when we sue the Forest Service on behalf of the groups, we cannot win a case where we put nothing on the table and then take pot shots at the agency's alleged failure to consider the relevant factors. And for that precise reason, the Trust can't win that kind of a case. I also want to address, Your Honor, there was points raised about the Forest Service's request for documentation to the Trust. I think it makes it all the more glaring the bare-bones nature of the Trust showing, given that the Forest Service gave them a second chance and, in effect, said, you didn't do it the first time, here's your chance to put something before us that can make a difference. They refused. And although counsel for the Trust says that certain of the documents were not part of the Forest Service's request, I think if you look at the actual request, which is on page 37 of the excerpts of record, you will see that number five in the Forest Service's enumerated list is any other factual information the Trust can provide that it believes I should consider with regard to its proposal. So not only did they have their first shot at it, they had a very broad second shot at it, and they never got the job done. And it's not fair to criticize the agency at this point for not having looked at all the proper factors. I think you may not be surprised to learn that we think wilderness does make a difference in the calculus. We agree that under the terms of the ANILCA provision, access must be provided, but it need only be access sufficient for the reasonable use, and I don't think the Trust has made any showing that the existing trails and helicopter access are not sufficient. And why does it make a difference? Well, Congress certainly in the ANILCA did not repeal the Wilderness Act, and this Court actually recognized that in its Montana Wilderness Association decision. The Forest Service recognized it when it promulgated the access regulations. The two have to be read together. What we think it means is that although it may be appropriate, and I emphasize may, in some circumstances on non-wilderness lands for the Forest Service to grant access, perhaps because it's more convenient, more cost-effective, whatever that may be for the landowner, I think when you're talking about wilderness, the burden becomes much higher, and the issue is, is it essential in order to permit this land use to go forward? And that's the question that is before the Court in this case. Last two points, Judge. Did you have a question, Your Honor? No. We're getting a little repetitious here. All right. Well, these will not be repetitious. I'll get to these last two points. The statutory framework for this case. The Wilderness Act, which the Trust cites repeatedly in its brief, makes clear that the right is a right to the right of in-holders is a right to access or exchange. It is not a pure right to access. The Forest Service here has offered a right, has offered exchange on multiple occasions. The Trust has not taken them up on the offer. And under the Wilderness Act, they have all the rights that they're due. Is that offer of exchange in this record? It is, Your Honor. It's in the Forest Service letter denying, I believe, the Trust's request. On page 25 of the Trust excerpts of record, the deciding Forest Service officer states, as I have stated in the past, the Forest Service is interested in acquiring the subject property by either purchase or exchange at appraised fair market value. Last point. Your Honor raised the question, are we over the ANILCA issue, the applicability of the ANILCA issue? We're not over it. And what you will see, Judge, when you look at our brief is we have raised the issue of the applicability of the ANILCA outside of Alaska, recognizing that this Court has addressed the issue in Montana Wilderness Association, but also noting the intervening Supreme Court authority in Village of Gamble, in which the Supreme Court addressed, admittedly, we understand another provision of the ANILCA. But in so doing, in ascertaining the congressional intent underlying the entire ANILCA statute, the Court took a tour, so to speak, of the ANILCA provisions and said, we think one factor affecting our decision that the particular provision before the Court did not apply outside of Alaska is that none of these provisions are meant to apply outside of the state of Alaska. And they specifically referenced Title XIII of the ANILCA, which is where the provision that the trust relies upon resides. And so we think that it is within the ---- So far as this Court, this panel is concerned, we have to follow our own precedent, do we not? Well, Your Honor, I think if you look at this Court's recent en banc decision in a case called Miller v. Gamble, what you see is that the en banc Court has said that when you have an intervening decision from a higher authority that calls into question the rationale of one of a prior panel decision, then a subsequent panel can revisit that question. And I do think it's within very two minor points on that. If you look at the briefs, what you'll see is the trust response is twofold. One, they didn't cross-appeal it. It's not preserved. There was nothing to cross-appeal. The district judge didn't decide the issue. In fact, explicitly set it aside. Two, the Court in Adams v. United States, a post-Village of Gamble decision, reaffirmed the MWA Montana Wilderness Holding that the ANILCA applies outside of Alaska. Crucially, what Adams did not do is look at Village of Gamble, say, here's what the Supreme Court has said in the meantime, here's how it affects our decision. That's what we're asking this Court to do, if you should decide, which we don't think you should, that the ANILCA provision provides a right of access beyond what the Forest Service provided in this case. Thank you very much. And we ask that you affirm the decision below. Thank you, counsel. Ms. Karpuk, you have some reserved time. One of the things we just heard is that the Wilderness Act provides no lasting impact. Yes, that is true, but, again, it is subject to existing private property rights. That is repeatedly in the Act, not just in 1134 but 1133 as well. And the Forest Service also fails to consider this Court's directive in Adams, that the owner must be able to freely access its property. Being forced to clear the trail of deadfall by non-mechanized means is not free access to the property. Being forced to hire a helicopter, which the record shows can be $570 to $3,200, is not free access to the property. The record also reflects that at times helicopters are not accessible because of the fire season, and that those, at least in the area of the property, that those helicopters are used to fight fires. We were asked why. Counsel, I'm sorry, you said that the helicopters are not. Available for use to. Because they're out fighting fires. Fighting fires, yes. But that would be, I mean, there are other times of the year that even if you had a road, that it might not be passable to get into the property. I mean, the fact that you can't get access all the time doesn't. I'm talking months, you know, months of the fire season. We've been in a drought in Montana, and there has been months. If you build this road, are you going to be able to get access all year round? And we've discussed that, and I'm not quite sure because of avalanche danger, if you could take a snowmobile up the road or not. The record's not clear on that. There was nothing for the record that I could. It would have to be by snowmobile and not by regular vehicle. I'm not sure the record's not clear on that. That was my own assumption. We were asked why the decision was arbitrary and capricious. It was also the failure to review the property outside the Absaroka Beartooth Wilderness. The Forest Service is charged with the duty to review the application. It merely made a few phone calls to three regions with no supporting documentation or research required. It was just phone calls. What do you know about? Do you know of any roads? No one was even asked to look at the records. We don't even know if these people were qualified to answer the question or even if they had worked at the Forest Service for any number of years so that they would have this knowledge in their head. There were 100 cases mentioned, and as we've said in our briefs, the Forest Service did nothing to research those cases further. Are they really similar to this property? Are they at altitude? Is that why they had road access prior to the wilderness designation? And the Trust wasn't hiding anything from the Forest Service. The Forest Service knows this property is at high altitude. It knows historically at the time the property was mined there were no vehicles. That was nothing they were trying to hide. And as I said, the Trust can clear the trail that was granted through 2001. Currently they don't have that permit, but by no mechanized means. At no time, as the record shows, has that trail been cleared of deadfall since the Trust has owned the property. It's impossible to get to this property right now freely as set forth in Adams. And with regard to the road. What about the fact that there are other non-Forest Service trails apparently referred to in Mr. Sanders? User trails, is that what you're talking about? In order to freely access the property, we'd have to maintain or do some construction work on those trails. And, again, that's going to require permits. Do you dispute his representation that these trails do exist? I know that there are representations that there are user trails that go to the property, and there are some in the record. But if you look at the supplemental excerpt in the letter where the Trust is under no uncertain terms told, they don't have the right to use those trails. Anything further? This is the type of property we believe that Congress envisioned when stating there are going to be times road access is necessary through the wilderness, through national forest lands, and it is going to impact those lands. But we have to protect private property rights to prevent a taking of personal rights. So I can't imagine if access is not allowed here where it will ever be allowed. And I would also like to address that we are accused of giving a bare-bones form to the Forest Service, but that's the form the Forest Service provides. You fill out in the little spaces, and that's what the Trust did. Then the burden is on the Forest Service to review the similarly situated properties, to review the impacts, and we submit that that was not done in the proper fashion because this property is uniquely situated. And the Forest Service had all that information. And the phone calls and just the bare-bones assertion is not enough here. And as far as the attempt to exchange land, it was, again, only a one-line sentence at the end of the letter. Thank you, Counsel. Your time has expired. The case just argued will be submitted for decision, and the Court will take a ten-minute recess at this time.
judges: O'scannlain, Rymer, Bybee